## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEYSTONE ASSOCIATES LLC, a Utah limited liability company; CABLE MOUNTAIN PARTNERS LLC, a Utah limited liability company; LARRY LUNT, an individual; JOHN LUNT, an individual, | ) ) ) ) ) |
| | ) C.A. No.  18-1235-MN |
| Plaintiffs, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| BENJAMIN FULTON, an individual; ELKHORN CAPITAL GROUP, LLC, a Delaware limited liability company, | ) ) ) |
| | ) |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiffs Keystone Associates LLC ("Keystone"), Cable Mountain Partners LLC ("Cable Mountain"), Larry Lunt, and John Lunt (together as "Plaintiffs" or the "Lunt Entities") hereby complain against defendants Benjamin Fulton ("Fulton") and Elkhorn Capital Group, LLC ("Elkhorn") (together as "Defendants") as follows:

## PARTIES, JURISDICTION, & VENUE

1.     Larry Lunt and John Lunt are individuals residing in Utah.  Larry Lunt is John Lunt's father.

2.     Plaintiff Keystone is a Utah limited liability company.  Larry Lunt and John Lunt are managers of Keystone.  Keystone is solely owned by Larry Lunt and his wife.

3.     Plaintiff Cable Mountain is a Utah limited liability company.  Larry Lunt and John Lunt are the managers of Cable Mountain.  Cable Mountain is solely owned by Keystone. Keystone and Cable Mountain are entities created solely to facilitate the Lunt family's investments.

4.      Defendant Elkhorn is a Delaware limited liability company with its principal place of business in Illinois.

5.      Defendant Fulton was, at all relevant times, the founder, manager and CEO of Elkhorn.

6.      The Lunt Entities assert claims arising under the Securities Exchange Act of 1934 and SEC Rule 10b-5.  This Court has subject matter jurisdiction over these claims pursuant to section 27 of the Securities Exchange Act of 1934 (*see* 15 U.S.C. § 78aa) and 28 U.S.C. § 1331. The Lunt Entities also assert state law claims.  This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

7.      Jurisdiction is proper over Elkhorn because it is a Delaware limited liability company.

8.      Jurisdiction is proper over Fulton because he was, at all relevant times, the founder, manager and CEO of Elkhorn and acted as its agent.  Specifically, the acts and misrepresentations of Elkhorn and Fulton were done with the permission, consent, knowledge, and active inducement on the part of the other.  These misrepresentations, as detailed below, form the basis of the Lunt Entities' claims.

9.      In addition, Fulton acted as the alter ego of Elkhorn.  Fulton and Elkhorn acted as single economic entity to commit the fraud described below.  On information and belief, Fulton had a large financial interested in Elkhorn such that the investments he solicited from the Lunt Entities directly benefitted him.  On information and belief, Fulton knew that investors would not place their money with an individual, so Fulton created Elkhorn to aid in his fraudulent scheme.

10.     Venue is proper in this District pursuant to § 27 of the Securities Exchange Act of 1934 (*see* 15 U.S.C. § 78aa), and 28 U.S.C. § 1391 in that Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

### A.     Fulton and Elkhorn

11.     Fulton was an early adopter and advocate of the exchange-traded fund ("ETF") and has worked in the investment industry for over 30 years.  ETFs are index-based products that allow investors to buy or sell shares of entire portfolios of stock in a single security.

12.     Fulton was a leader of Invesco PowerShares Capital Management ("PowerShares").  He became the managing director of PowerShares' global ETF business in 2009.  When Fulton left PowerShares in 2013, it managed nearly $80 billion in assets.

13.     After leaving PowerShares, Fulton founded and became the CEO of Elkhorn in 2013.  Elkhorn held itself out as a leading independent investment solutions firm pioneering innovative research-based financial products in a wide array of investment structures.

14.     Elkhorn had a strategic partnership with Barclays Capital Inc. ("Barclays") and advertised this partnership prominently on its website.

### B.     The Lunts' Interest in Elkhorn

15.     Attracted in part by Fulton's experiences in the ETF industry, the Lunts explored opportunities to invest in Elkhorn.

16.     On February 6, 2016, John Lunt sent Fulton an email to learn more details about Elkhorn in order to consider making an investment.

17.     Fulton understood that John and Larry Lunt were making a family investment and responded to the email for the purpose of inducing an investment.  In response to a question from

John Lunt about the current ownership of Elkhorn, Fulton stated that the "only outside investor

before *your family* is" a single individual with 500 units.  Indeed, in all communications between

Elkhorn, Fulton, and the Lunts, Defendants understood that they were dealing with the Lunts and

that both Keystone and Cable Mountain were Lunt family entities.

18.    In response to Lunt's questions about arrangements with other business

associates, Fulton highlighted Elkhorn's relationship with Barclays.  Fulton said that Barclays

was providing "a total of $5,000,000 in capital," with $3,000,000 being a 5-year interest only

loan and the remainder being an annual marketing agreement for $500,000 every May through

2018.

19.    Fulton asked Phil Ziesemer, the Chief Financial Officer of Elkhorn, to confirm

that the representations made by Fulton in the February 6, 2016 email about the Barclays

relationship were correct, and Ziesemer confirmed that Fulton's representations were correct—

with the exception of changing the annual payment date of the $500,000 from May to June.

20.    Elkhorn's purported relationship with Barclays, wherein Barclays was represented

as providing a significant amount of money to Elkhorn (a total of $5,000,000 in capital, with

$2,000,000 coming from the purported annual marketing agreement), was a critical factor in the

Lunts' decision to invest in Elkhorn.  Specifically, the Lunts relied on the representation that

Barclays would provide $2,000,000, without any stated conditions, when the Lunts analyzed the

future cash needs of the company and decided to invest.  Furthermore, Elkhorn's website touted

its "strategic partnership" with Barclays to promote the appearance of financial stability and

credibility.  Barclays itself claimed that Elkhorn was "very complementary to Barclays' business,

and very aligned to investors' needs."

4

21.     The Lunts trusted Barclays' reputation.  Barclays' confidence in providing

Elkhorn with an annual marketing agreement worth a total of $2,000,000, and having Elkhorn

sell products on their behalf gave the Lunts the confidence to invest in Elkhorn.  The Lunts thus

reasonably relied on Elkhorn's representation about the details of its financial agreement with

Barclays in their decision to invest.

## C.     The Lunt Entities' Investment in Elkhorn

22.     On or about February 18, 2016, the Lunts made their first investment in Elkhorn

through Keystone.  Keystone invested $1,000,000 and received 1,110 Class A membership units

of Elkhorn.  These membership units have always been owned by the Lunt Entities and are

currently owned by the Lunts through Keystone.

23.     The subscription agreement entered into between Elkhorn and Keystone

identifies, acknowledges, and incorporates the representations previously made by Elkhorn and

Fulton about the Barclays relationship, stating that the Company "has afforded Keystone the

opportunity to discuss the investment with and to ask questions of the Company and has

provided answers to all of Keystone's questions . . ." and "Keystone acknowledges having

received satisfactory answers to all of his questions from representatives of the Company . . . ."

24.     The subscription agreement contained a standard integration clause that stated,

"[t]he parties each acknowledge and represent that no promise, representation, or inducement not

contained in this Agreement has been made to them and that this Agreement contains the entire

understanding between the parties with respect to the subject matter hereof."  The Lunts

understood this provision in the context of the provision quoted above showing that the Lunts

were relying on the answers provided by Elkhorn in response to their questions.  In addition, this

clause was not heavily negotiated and was not highlighted, bolded, capitalized, or called out in

any way; rather, it was a boiler plate clause near the end of the contract and was not intended to waive Defendants' obligations under the Securities Exchange Act of 1934 or the common law.

25.    On or about June 29, 2016, the Lunts, through Cable Mountain, entered into an agreement with Elkhorn to provide a loan of $1,000,000 to Elkhorn in exchange for a promissory note. Cable Mountain had the option to convert this promissory note into equity of Elkhorn. Cable Mountain is an intermediate holding entity that was created for the purpose of facilitating Plaintiffs' purchase of securities. It was the Lunts who contributed the money for the Elkhorn investment and were the de-facto purchasers of the securities.

26.    Fulton and Elkhorn knew that the managers of Cable Mountain were John and Larry Lunt and that the Lunts were relying on the past representations made to them by Defendants, including the false and misleading misrepresentations identified herein, when entering into the June 29, 2016 agreement. Fulton and Elkhorn further knew that Cable Mountain was created by John and Larry Lunt to facilitate a family investment.

27.    The representations made by Fulton and Elkhorn on February 6, 2016 about the details of Elkhorn's financial agreement with Barclays were reaffirmed to John and Larry Lunt after April 29, 2016, and Fulton and Elkhorn encouraged the Lunts to rely on those misrepresentations when making the June 29, 2016 investment through Cable Mountain.

28.    On or about January 30, 2017, Keystone provided Elkhorn with a loan of $500,000 in exchange for a convertible promissory note. Under this promissory note, Keystone had the option to convert all or any portion of the principal amount and accrued interest of the loan into equity of Elkhorn.

29.    The Lunt Entities did not discover that the answers they received from Elkhorn and Fulton, and upon which they trusted and relied, were false and misleading until May 2, 2017.

6

30.    The transactions of February 18, 2016, June 29, 2016, and January 30, 2017 all included the sale of non-registered securities.

D.    **Elkhorn's Misrepresentation and Insolvency**

31.    Fulton and Elkhorn misrepresented Elkhorn's relationship with Barclays in order to raise capital.  Contrary to their representation, the annual $500,000 marketing payment was contingent upon Elkhorn selling $100 million of Barclays' products annually—it was not guaranteed money.

32.    Fulton's statements to the Lunts omitted this key contingent requirement in the Barclays agreement.  Fulton's and Elkhorn's omission made the representation misleading by making it appear that the $500,000 annual marketing payment was unconditional.

33.    Further, when Fulton sent the February 6, 2016 email, he knew that Elkhorn was not selling any significant amount of Barclays products and did not have any realistic possibility of selling $100 million of Barclays products annually.  Fulton therefore knew that Elkhorn would not receive the remaining $500,000 installments.  Fulton knowingly omitted this material information with the intention of misleading the Lunt Entities.

34.    The decision to include the facts favorable to Elkhorn (i.e., the $500,000 annual marketing payment) without the facts unfavorable to Elkhorn (i.e., that the $100 million contingency was never going to be met), show that Fulton and Elkhorn were trying to paint a more positive picture to induce Plaintiffs' investment.  Given that the annual marketing payment was not going to be paid, there was no reason for Fulton to mention the $500,000 annual marketing payment other than an intent to induce the Lunts' investment.

35.    Elkhorn's failure to sell Barclays' products contributed to a larger problem with its distribution method.  By failing to sell Barclays products, Elkhorn was unable to sell a

significant number of other ETFs that it would have been able to sell with a stronger Barclays'

relationship.  Due to its failed relationship with Barclays, Elkhorn was largely unsuccessful.

36.     Elkhorn is now insolvent and has no assets of significance.  the Lunt Entities'

equity and debt are essentially worthless.

37.     If the misrepresentations made about Elkhorn's relationship with Barclays were

true, including that the $500,000 annual marketing payment was actually unconditional, it would

have meant that Elkhorn had much stronger connections with Barclays, strengthening Elkhorn's

position in the market.  Further, Elkhorn would have received an additional $1,500,000 from

Barclays, money that could have been used to market and sell products and to strengthen its

distribution method.  This additional money also would have prevented insolvency.

Accordingly, the facts about which Fulton and Elkhorn made misrepresentations are the same

facts which are related to and caused the Lunt Entities' loss.

### FIRST CAUSE OF ACTION
**(Securities Fraud in Violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5)**

38.     Plaintiffs incorporate and reallege all paragraphs as though fully set forth herein.

39.     Fulton and Elkhorn misrepresented a material fact in connection with the sale of

securities by stating in writing to the Lunts that Barclays would provide a total of $5,000,000 in

capital, despite this amount being contingent upon events that Fulton and Elkhorn knew would

not occur.  Fulton and Elkhorn also made a misleading statement and material omission in

connection with the sale of securities by failing to inform the Lunts that the marketing agreement

between Elkhorn and Barclays was contingent upon Elkhorn selling $100 million annually of

Barclays affiliated products and that Elkhorn did not have any realistic possibility of satisfying

this requirement.

40.    The Lunt Entities reasonably relied on Defendants' material misrepresentations and omissions in their purchase of securities from Elkhorn.  Had Defendants disclosed the nature of the contingencies with Barclays, the Lunt Entities would have realized the additional money from Barclays would not be forthcoming and would not have invested in Elkhorn.  Accordingly, Plaintiffs' reliance is directly connected to Defendants' misrepresentations about the amount of money that Barclays was providing to Elkhorn, including Defendants' failure to inform the Lunts that the $2,000,000 marketing payment was contingent upon Elkhorn selling $100 million annually of Barclays affiliated products.

41.    Defendants' misrepresentations and omissions caused the Lunt Entities to purchase securities that it would not otherwise have purchased and to pay an inflated price for those securities, resulting in damages in an amount of not less than $2,500,000.

42.    Defendants' misrepresentations and omissions are directly related to Elkhorn's insolvency and the Lunt Entities' loss.  Had Defendants' representations been true, Elkhorn would have been able to use the additional money and its strengthened relationship with Barclays to avoid insolvency.

43.    Defendants' acted with an intent to deceive, as they knew their representations were false, knew that they were omitting material facts, and knew that such misleading statements would induce the Lunt Entities to invest in Elkhorn.

## SECOND CAUSE OF ACTION
### (Common Law Fraud and Fraudulent Inducement)

44.    Plaintiffs incorporate and reallege all paragraphs as though fully set forth herein.

45.    Fulton and Elkhorn made a knowingly false statement of material fact when stating in writing that Barclays would provide a total of $5,000,000 in capital, despite this amount being contingent upon events that Defendants knew would not occur.  Fulton and

9

Elkhorn also made a material omission by failing to inform the Lunts that the marketing

agreement between Elkhorn and Barclays was contingent upon Elkhorn selling $100 million

annually of Barclays affiliated products and that Elkhorn did not have any realistic possibility of

satisfying this requirement.

46.    Fulton and Elkhorn made the misleading statements and omissions for the

purpose of inducing the Lunt Entities to invest in Elkhorn.  The Lunt Entities did reasonably rely

on the statements and omissions made by the CEO and CFO of Elkhorn in response to their

written questions when investing in Elkhorn and entering into the accompanying agreements,

including, but not limited to, the Subscription Agreement dated February 18, 2016.

47.    In addition to inducing Plaintiffs to invest in Elkhorn, the misrepresentations

fraudulently induced Plaintiffs to represent in the Subscription Agreement that Keystone had

received satisfactory answers to all of its questions from representatives of Elkhorn.  While the

answers received would have been satisfactory if they had been true, the answers received from

Elkhorn were not true.  If Plaintiffs would have known that the answers received were false,

Plaintiffs would not have made that representation in the Subscription Agreement and would not

have entered into the Subscription Agreement.

48.    Defendants' misrepresentations and omissions caused the Lunt Entities to

purchase securities, including convertible debt, that it would not otherwise have purchased and to

pay an inflated price for those securities, resulting in damages in an amount of not less than

$2,500,000.

## THIRD CAUSE OF ACTION
**(Negligent Misrepresentation)**

49.    Plaintiffs incorporate and reallege all paragraphs as though fully set forth herein.

10

50.     Defendants had a pecuniary duty to provide accurate information in connection with the sale of securities.

51.     Defendants provided false information in connection with the sale of securities by stating in writing to the Lunts that Barclays would provide a total of $5,000,000 in capital, despite this amount being contingent upon events that Defendants knew would not occur. Defendants also made a material omission in connection with the sale of securities by failing to inform the Lunts that the marketing agreement between Elkhorn and Barclays was contingent upon Elkhorn selling $100 million annually of Barclays affiliated products and that Elkhorn did not have any realistic possibility of satisfying this requirement.

52.     Fulton and Elkhorn failed to exercise reasonable care in providing the false information.

53.     Defendants were in a better position than the Lunt Entities to know the true facts, as the representations related to the relationship and agreement between Elkhorn and Barclays.

54.     As the direct recipient of the money, Elkhorn had a financial interest in obtaining an investment from the Lunt Entities.  As the founder and CEO of Elkhorn, Fulton had a financial interest in Elkhorn receiving the investment.

55.     The Lunt Entities justifiably relied on the representations about the details of the partnership between Elkhorn and Barclays that were made by Defendants when making the decision to invest in Elkhorn.  Defendants should have reasonably foreseen that the Lunt Entities were likely to rely upon the misrepresentations. The Defendants' false information caused the Lunt Entities to purchase securities, including convertible debt, that it would not otherwise have purchased and to pay an inflated price for those securities, resulting in damages in an amount of not less than $2,500,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Fulton and Elkhorn as follows:

A.      For damages, including punitive, in an amount to be fully determined at trial;

B.      For reasonable costs and attorneys' fees; and

C.      For such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.


|  |  |
|---|---|
| OF COUNSEL | POTTER ANDERSON & CORROON LLP |
| | By: */s/ Jonathan A. Choa* |
| David J. Jordan | Timothy R. Dudderar (# 3890) |
| Michael R. Menssen | Jonathan A. Choa (#5319) |
| STOEL RIVES LLP | Hercules Plaza |
| 201 S. Main Street, Suite 1100 | P.O. Box 951 |
| Salt Lake City, UT 84111 | Wilmington, DE  19899-0951 |
| (801) 328-3131 | (302) 984-6000 |
| | |
| Dated:  August 29, 2019 | *Attorneys for Plaintiffs* |
| 6361727 | |

12